**TENNESSEE GAS PIPELINE COMPANY, A DIVISION OF TENNECO INC., Petitioner,**

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 87–1651.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 23, 1988.

Decided Oct. 28, 1988.

Robert H. Benna, with whom Terence J. Collins, Washington, D.C., Margaret L. Bollinger, Harold L. Talisman and Richard H. Davidson, Washington, D.C., were on the brief for petitioner. David D. Withnell, Washington, D.C., also entered an appearance for petitioner.

Joanne Leveque, Atty., F.E.R.C., with whom Catherine C. Cook, Gen. Counsel, Jerome M. Feit, Sol. and John N. Estes, III, Atty., F.E.R.C., Washington, D.C., were on the brief for respondent.

William I. Harkaway, Harvey L. Reiter, Washington, D.C., and Barbara M. Gunther, Brooklyn, N.Y. entered appearances for intervenor, Consolidated Edison Co. of New York, Inc.

Michael J. Manning, James F. Moriarty and James P. White, Washington, D.C., entered appearances for intervenor, Tennessee Small Gen. Service Customer Group.

William H. Penniman and James M. Bushee, Washington, D.C., entered appearances for intervenor, Process Gas Consumers Group.

Richard A. Solomon and David D'Alessandro, Washington, D.C., entered appearances for intervenor, Public Service Com'n of the State of N.Y.

James R. Choukas–Bradley, Washington, D.C., entered an appearance for intervenor, Cities of Clarksville, Springfield, and Portland, Tenn.

Joseph C. Bell and Jeffrey T. Sprung, Washington, D.C., entered appearances for intervenor, Citizens Energy Corp., et al.

Before WALD, Chief Judge and MIKVA and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

This case concerns an appeal by Tennessee Gas Pipeline Co. ("Tennessee") of a sequence of orders of the Federal Energy Regulatory Commission ("FERC") rejecting Tennessee's proposal to modify its rate schedules so as to allow its full-requirements customers to purchase interruptible transportation services from the pipeline at a rate which differed from that charged other purchasers of this service.

The case requires us to consider anew the relationship between §§ 4 and 5 of the Natural Gas Act, 15 U.S.C.A. § 717–717w (1976), and the scope of the FERC's authority in fashioning a remedial order after reaching a determination that a pipeline's proposed rate schedules are unjust, unreasonable or unduly discriminatory. We hold the Commission must affirmatively show that any rate[1] it imposes in a § 4 remedial order as a revision or modification in the filed tariff satisfies the § 5 requirement that such rate be just and reasonable. This incorporation of § 5 requirements into Commission-imposed rates growing out of § 4 proceedings derives from the statutory language of § 4 which restricts the Commission's remedial authority to issuing such orders "as would be proper in a proceeding initiated after [the rate] had become effective." We find that the FERC failed to make this required determination, even though its threshold conclusion that Tennessee's proposed rates were unlawful is supported by substantial evidence. We remand to the Commission for further proceedings to determine whether the effect of its order eliminating the full requirements provision for a class of Tennessee's customers and requiring Tennessee to provide interruptible transportation for such customers at a uniform rate with its other customers is just and reasonable.

## I. BACKGROUND

### A. *Factual Context*

Tennessee supplies natural gas to several hundred customers from Texas to New England. Among its customers are a number of small customers, known as GS ("small general service") customers. GS customers are natural gas companies primarily servicing the needs of small towns; all of these customers have only a single pipeline connection and thus are "captive" customers in the sense that any natural gas they receive must be delivered over Tennessee's line.

Tennessee offers two basic services to its customers: sales of natural gas from Tennessee's own supplies and transportation of natural gas purchased from suppliers other than Tennessee. Both sales and transportation can (potentially) be purchased on either a "firm" or an "interruptible" basis. "Firm sales," for example, entitle a purchaser to preference over interruptible customers in case of capacity or supply constraints. Firm sales customers reserve a maximum daily and annual quantity entitlement in their contract with Tennessee; Tennessee is obligated to supply up to the reserved quantity on demand.

---

[1]. The term "rate" is used throughout this opinion to mean the entirety of a rate schedule including contractual provisions, methodologies for allocating costs, restrictions on availability of the schedule as well as quantity and price terms.

A customer qualifies as a GS customer if its daily entitlement does not exceed a specified level.[2] For many years, Tennessee has offered a special firm sales rate to such customers. Other firm sales customers pay a two-part rate: a flat annual charge known as a demand charge and a per-unit charge. The demand charge is calculated on a per-unit basis from the quantity entitlement, but is collected regardless of the actual number of units of gas delivered over the year. The per-unit charge is collected based on the number of units delivered and is composed of what is known as a commodity charge and the price of gas. GS customers, however, pay only a one-part rate, that is, a rate charged per-unit of actual deliveries; GS customers do not pay a separate demand charge. Instead, the demand charge they would ordinarily pay separately as regular firm sales customers is computed into a per-unit charge and becomes part of the commodity charge.[3]

In order to calculate how much to charge *per unit* to recoup the demand charge, Tennessee takes the demand charge it would collect from a regular firm sales customer for the amount reserved in the entitlement and assumes that the GS customer will in fact purchase 62% of its entitlement over the year. Dividing the demand charge by this quantity (62% of the entitlement) gives the amount per unit that a GS customer will pay towards the demand charge. If the GS customer in fact purchases 62% of its entitlement, its per-unit payments add up over the course of a year to the same flat demand charge paid by a regular firm sales customer. GS customers, however, have historically purchased *less* than 62% of their entitlement annually. As a consequence, their total payments toward the demand charge are normally less than the charge that would be paid under the regular firm sales schedule.

As the *quid pro quo* for this lower effective demand charge,[4] GS customers historically have been subject to a full requirements clause in their contracts. This clause obligates GS customers to purchase natural gas solely from Tennessee. Regular firm sales customers are partial requirements customers: although Tennessee is obligated to supply a contracted-for quantity, these customers are free to purchase gas elsewhere. The full requirements provision reduces the variability in demand from the GS customer by preventing such a customer from switching to an alternative supplier and thus constitutes the consideration Tennessee receives for the lower demand charge collected. *See* Brief for Petitioner at 5.

### B. *Procedural Setting*

The FERC is empowered to regulate the rates charged by natural gas pipelines by virtue of the Natural Gas Act, 15 U.S.C.A. § 717–717w (1976). The regulatory stance of the Act has been interpreted to involve "neither [ ] 'ratemaking' nor [ ] 'rate-changing,' " *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 341, 76 S.Ct. 373, 379, 100 L.Ed. 373 (1956):

> Recognizing the need ... circumstances create for individualized arrangements between natural gas companies and distributors, the Natural Gas Act permits the relations between the parties to be established initially by contract, the protection of the public interest being afforded by supervision of the individual

---

**2.** In the filings currently under review, this limit is 5,100 dekatherms a day. Joint Appendix (J.A.) 19. In 1986, GS sales entitlements accounted for less than 1% of total sales entitlements on the Tennessee system. *See Index to Purchasers*, J.A. 26–35. GS customers almost never have requirements in excess of their daily entitlement. Brief for Petitioner at 78 n. 22.

**3.** In designing two-part rates, most of the fixed costs incurred in taking on the obligation of supplying entitlements on demand are allocated to the demand charge; other fixed and variable costs of supply are allocated to the commodity charge. The one-part rate design therefore effectively allocates all fixed and variable costs to the commodity charge.

**4.** Tennessee characterizes this lower charge as a "subsidy" for the GS customer. There is nothing to suggest that it in fact fails to cover the cost of reserving capacity for the small customer, a cost which might well be lower *per unit* than that incurred in reserving the larger entitlements of regular firm sales customers.

contracts, which to that end must be filed with the Commission and made public. *Id.* at 339, 76 S.Ct. at 378.

As emphasized in a number of recent decisions in this circuit,

[t]hree interrelated sections constitute the 'comprehensive and effective regulatory scheme' Congress created with regard to ratemaking. Section 7 provides that to undertake the 'transportation or sale of natural gas,' an entity must first obtain 'a certificate of public convenience and necessity issued by the Commission.' ... Once rates are authorized under section 7, a natural gas company may file for an increase under section 4.... On the other hand, [in the absence of a rate filing], if rates are unjust or unreasonable, the Commission may adjust them pursuant to section 5.

*Northern Natural Gas Co. v. FERC,* 827 F.2d 779, 781 (D.C.Cir.1987) (quoting *Panhandle Eastern Pipe Line Co. v. FERC,* 613 F.2d 1120, 1127–28 (D.C.Cir.1979)).

All rates established under the Act must be 'just and reasonable'. 15 U.S.C.A. § 717c(a) (1976). Section 4 places the burden on the filing pipeline of proving that *proposed* rates are just and reasonable. Section 5 imposes the burden of proof on the Commission to demonstrate that *existing* rates are unjust and unreasonable. *Id.* at 513.

The instant case arises from Tennessee's efforts in a § 4 filing to respond to increased competition in the natural gas industry. In an order that "may well come to rank with the three great regulatory milestones of the industry," *Associated Gas Distributors v. FERC,* 824 F.2d 981, 993 (D.C.Cir.1987), the FERC took steps in 1985 to open the natural gas industry to increased competition by requiring that pipelines transport gas on an open-access basis. *Order No. 436,* 50 Fed.Reg. 42,408 (1985). The effect of Order No. 436 has been to enable pipeline customers to gain access to the competitive wellhead market for natural gas, thereby reducing gas costs and improving the transmission of market signals between producers and consumers.

In connection with its transformation into an open-access transporter, Tennessee filed with the FERC on December 8, 1986 ("first filing") new and revised rate schedules to govern the web of modified services it proposed to offer in accordance with Order No. 436. On review here is a component of this filing which affected the rate schedules facing GS customers. Tennessee proposed in this first filing (as the only pipeline connected to its GS customers) to provide transportation services to these customers. Logically, of course, the offer of this new service entailed specifying a rate at which such service would be sold. And, also logically, offering the service meant releasing GS customers from their obligation under the full requirements provision to purchase gas solely from Tennessee. Formally, Tennessee accomplished these steps by (1) modifying the full requirements provision in its GS sales rate schedule to read as follows [proposed changes are shown in italics]:

1. This Rate Schedule is available for the purchase from Tennessee Gas Pipeline Company ... of natural gas for resale, to any buyer ... (c) which does not ... (ii) purchase gas direct from other suppliers; *except Buyer may receive gas described in ... (ii) by transportation service pursuant to Seller's Rate Schedules FT–A, FT–B and/or IT.* [5]

J.A. 19 and (2) modifying its IT (interruptible transportation) rate schedule to read as follows:

The rates for service under the IT Rate Schedule for all customers *other than those who also purchase from Seller under its GS Rate Schedule* are the applicable IT rates shown on effective Tariff Sheet No. 23; ... *The rate for those customers who also purchase under Seller's GS Rate Schedule shall be the commodity rate under the GS Rate Schedule.*

J.A. 24.

The rate at which Tennessee proposed to provide interruptible transportation service

---

**5.** Rate Schedules FT–A and FT–B are firm transportation rates; Rate Schedule FT–B was rejected by the Commission. These firm rate schedules are not before this court on review.

to GS customers (the "GS–IT" rate) differed from the rate charged all other customers making use of this service. Tennessee proposed to charge GS customers the GS commodity rate, a rate charged per-unit of gas *sold* to GS customers under the firm sales schedule. Thus, under Tennessee's proposal, GS customers would continue to make their payments toward demand charges on a per-unit basis for every unit of gas they used, regardless of whether they purchased that gas from Tennessee or merely transported gas purchased from other suppliers on Tennessee's pipeline.

Tennessee argues that since it is still obligated to supply the GS customers' entitlements on demand, it incurs the same level of fixed costs associated with that obligation regardless of whether GS customers purchase from Tennessee or other suppliers. Brief for Petitioner at 23. The demand charge compensates Tennessee for these fixed costs; had GS customers been ordinary firm sales customers, they would have continued to pay the same flat demand charge whether or not they chose to take advantage of transportation services. However, because of the special one-part design of the GS sales rate, reductions in actual· deliveries to GS customers reduce the demand charge collected. To avoid this lost recovery of a portion of the fixed cost incurred in its obligation to provide firm sales, Tennessee argues, it needs to continue to collect the imputed per-unit demand charge on transported gas.

The FERC rejected Tennessee's proposal in an order issued January 7, 1987. *Tennessee Gas Pipeline Co.*, 38 F.E.R.C. ¶ 61,004 (January 7, 1987) ("first order"). The FERC found three deficiencies in Tennessee's proposed GS–IT rate: failure to specify maximum and minimum rates in accordance with 18 C.F.R. § 284.7(d)(5)(i) (1988); failure to separately identify transmission, storage and gathering components as required by 18 C.F.R. § 284.7(d)(1) (1988); and discrimination in that the regular IT rate computed mileage charges based on the distance over which gas was transported whereas the GS–IT rate com-

puted mileage based on sales zones, *i.e.*, the distance between *Tennessee's* supply point and the delivery point, not the distance between the *actual* supply point and the customer. 38 F.E.R.C. at 61,017. Based on these deficiencies, the FERC required Tennessee to amend its tariff sheets to eliminate the GS–IT rate. Because the GS rate had been styled as an exception in the IT rate schedule available to other customers, this revision made the regular IT rate for transportation available to "all customers." Moreover, because the Commission's order accepted the GS sales schedule without revision, it reflected the provision that GS sales customers could purchase gas from alternative suppliers "pursuant to the Seller's Rate Schedule[ ] . . . IT." Thus the Commission's first order, while rejecting Tennessee's own proposal for providing interruptible transportation to GS customers, effectively required such transportation services to be provided at the regular IT rate and eliminated Tennessee's longstanding full requirements provision from its specially-tailored GS sales rate schedule.

Tennessee responded to this order in three ways. First, it amended its tariff sheets as required, subject to its right to seek rehearing, thus putting the IT service for GS customers at the regular IT rate into effect as of the effective date of the filing (December 10, 1986). Second, Tennessee made a new filing on January 16, 1987 ("second filing"). This filing corrected the first two (technical) deficiencies in its first filing, but left in place the proposal to offer IT service to GS customers at the GS commodity rate. The filing also proposed an alternative in the event that the Commission again rejected the GS–IT rate: restoration of the full-requirements provision to the GS sales schedule. In its cover letter accompanying this filing, Tennessee argued that the regular IT rate for GS transportation was discriminatory with respect to Tennessee's other customers and resulted in underrecovery of fixed costs as a result of the interaction between the special one-part rate design and the elimination of the full requirements provision.[6]

6. Tennessee styles this latter argument as an

"increase" in the "subsidy" accorded GS custom-

Third, Tennessee filed for rehearing of the first order, reiterating its argument that the GS–IT rate it had proposed was necessary to avoid discrimination against other customers and the underrecovery of fixed costs. Tennessee emphasized that it did not read Order No. 436 to *require* that it provide IT service to full-requirements customers but only that it allow such customers to switch to partial-requirements status (paying the regular two-part rate) in order to make use of transportation services.

On February 13, the FERC rejected both of the proposals made in Tennessee's second filing: it rejected the technically-corrected GS–IT rate and it rejected Tennessee's proposal to return the full-requirements provision to the GS sales rate schedule. *Tennessee Gas Pipeline Co.*, 38 F.E.R.C. ¶ 61,154 (February 13, 1987) ("second order".) In rejecting the GS–IT rate, the Commission noted only that the GS–IT rate continued to reflect mileage charges based on sales zones rather than mileage blocks and thus continued to discriminate against GS customers. 38 F.E.R.C. at 61,434. The Commission did not address Tennessee's arguments regarding the discriminatory effect of the first order (now the "status quo"). In rejecting Tennessee's alternative proposal, to restore full requirements, the Commission treated this proposal as one to change the status quo established by its first order. It thus placed the burden on Tennessee of proving why a full requirements provision was just and reasonable, independent of its historic use and Commission precedent. The Commission stated only:

> Tennessee has filed to become an open-access transporter pursuant to Order No. 436. Transportation services provided thereunder must be made available on a non-discriminatory basis. Adoption of Tennessee's proposed alternate tariff sheets would preclude GS customers from availing themselves of open-access transportation services. This would re-

sult in undue discrimination against Tennessee's GS customers.

*Id.* The Commission did not address Tennessee's argument that the FERC in Order No. 436 had specifically found that full-requirements provisions were not summarily violative of the open-access mandate. *See Order No. 436*, 50 Fed.Reg. at 42,445.

Tennessee filed for rehearing of this order also. Recognizing that the two orders dealt with essentially the same Commission action, the FERC issued a single order denying rehearing of both. *Tennessee Gas Pipeline Co.*, 41 F.E.R.C. ¶ 61,137 (November 4, 1987) ("rehearing order".) In this order, for the first time, the Commission addressed Tennessee's arguments on discrimination and the recovery of fixed costs. The Commission stated that

> Tennessee may not recover costs through its transportation rate which are allocated to sales.... Whether the GS rate is subsidized as Tennessee implies is not at issue here, where we are concerned with open-access transportation rates.

41 F.E.R.C. at 61,343–44.

While recognizing the thrust of Tennessee's arguments, the Commission simply rejected them as irrelevant. It thus upheld the remedy fashioned by the first order: elimination of the full requirements provision and GS transportation at the regular IT rate.

With respect to the rejection in the second order of the alternative proposal—restoration of the full requirements provision —the Commission elaborated on its analysis of why the full requirements provision was discriminatory. It found that Tennessee had not proved its argument that full requirements customers could switch to partial requirements status, and thus were not prevented from gaining access to transportation services; the Commission stated that the partial requirements schedule was "not designed to accommodate the characteristics of Tennessee's small full requirements customers," *id.* at 61,344, and thus

---

ers. Rejecting Tennessee's characterization of the historical GS rate as a "subsidy" and assuming that it at least covers fixed costs attributable to the provision of GS firm sales, this argument

translates into an assertion that the IT rate results in underrecovery of fixed costs. Tennessee clarified this position at oral argument.

effectively precluded them from transportation. The Commission then argued that "in addition," *id.*, to the inappropriate design of the partial-requirements schedule, the full-requirements provision was a barrier to access because GS customers are served by only one pipeline:

> We believe that Tennessee's full requirements provision is a barrier to access to competitively priced gas. There is no pipeline-to-pipeline competition because Tennessee is the only pipeline serving these customers. However, other gas suppliers cannot compete for sales, and GS customers cannot purchase from other suppliers.

*Id.*

Although the Commission stated that "our ruling in this case [does not] mean that all full requirements clauses are improper," *id.* at 61,345, it held that

> in this case, *where a customer has no real opportunity to pursue the benefits afforded by competition in the gas market*, the barrier to that opportunity is unacceptable.

*Id.* (emphasis added).

Since the Commission found that the highlighted condition was met by virtue of the fact that Tennessee is the only pipeline serving GS customers, its decision could be read as a *per se* holding that where there is a single pipeline connection, full-requirements provisions are in violation of Order No. 436's open-access mandate.

## II. DISCUSSION

### A. *The Effect of the Commission's Action*

Our review of the FERC's action is limited. The Commission has broad discretion in exercising its authority under the Natural Gas Act, *see* 15 U.S.C.A. § 717*o* (1976), and a reviewing court must not "substitute its judgment for that of the agency." *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). The Commission's action must be sustained unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.A. § 706(2)(A) (1977).[7]

■ The FERC's authority in this case arose at the outset under § 4, triggered by Tennessee's first filing of its proposal to offer interruptible transportation to GS customers at the GS–IT rate. Thus Tennessee bore the burden of proving that its proposal was "just and reasonable," a burden that the Commission found in its first order Tennessee had not met. This element of the Commission's action in the first order is by itself sustainable. The rate clearly was defective in failing to comply with the technical requirements unambiguously set out by regulation[8]; moreover, although the first order does not itself demonstrate that the rate was discriminatory by virtue of the method of mileage calculation,[9] in light of the Commission's elaboration of its argument in the rehearing order, the finding of discrimination in the rate is also supported by substantial evidence.

■ Our scrutiny of the Commission's action in this first order must focus on what the Commission did *after* it had reached this determination that Tennes-

---

7. As we have noted elsewhere, "[a]lthough 15 U.S.C. § 717r(b) specifies that the 'findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive,' ... this is no more than a recitation of the application of the 'arbitrary and capricious' standard of factual findings." *Maryland People's Counsel v. FERC*, 761 F.2d 768, 774 (D.C.Cir.1985).

8. The specification of minimum and maximum rates and the disaggregation of the rate into several components as required by 18 C.F.R. §§ 284.7(d)(5)(i), 284.7(d)(1).

9. This order merely recites the fact that the rate for GS customers differs from the rate for regular IT customers. Mere difference, however, is not discriminatory; there must also be a demonstration that the two classes of customer are similarly situated for purposes of the rate. *See Associated Gas Distributors v. FERC*, 824 F.2d 981, 1009 (D.C.Cir.1987), *cert. denied sub nom Interstate Natural Gas Association v. FERC*, — U.S. —, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988). ("That the criteria governing permissible rates in ... two categories are different ... does not establish discrimination between them.").

see's proposal was unlawful. Decoupling the modification of the GS sales rate schedule to allow GS customers to purchase gas from alternative suppliers "pursuant to the Seller's Rate Schedule[ ] ... IT" from the modification of the proposed Rate Schedule IT, the Commission "accepted" the former while "rejecting" the latter.

This characterization of the Commission's action as "acceptance" and "rejection" of pipeline-proposed rates, however, is misleading. Ordinarily in § 4 cases, only accepted provisions alter the status quo because rejection of a proposed *change* in a rate leaves *existing filed rates* in effect. In the ordinary course of events, this ensures that all rates that are ultimately in effect have been found to be just and reasonable: accepted rates have been proved by the pipeline to be lawful; rejected rates leave intact existing rates previously found to be lawful either in a § 4 filing or a § 5 Commission-initiated review.

Here, however, the rejected provision altered the status quo. Rejection of the modification to the IT schedule, *together with* acceptance of the modification to the GS sales schedule constituted imposition of a rate: the regular IT rate for GS interruptible transportation. The subtlety of this rate imposition arises from the fact that Tennessee styled the GS–IT rate as an exception to a schedule otherwise written in universal terms. Had the rate schedule in fact listed each class of customer particularly, identifying the rate at which IT services would be provided by class, then "rejection" of Tennessee's proposed modification to the IT schedule *would* have resulted in the maintenance of the pre-filing status quo: the absence of an IT rate for GS customers. Making IT transportation available to GS customers in this context would have required the Commission to take the more visible action of adding the GS customers to the IT schedule and specifying a rate for this class. While less obvious, the Commission's action in this case essentially did just this. Prior to Tennessee's filing, there was *no* IT rate for GS customers on file; "rejection" of the proposed GS–IT rate for the *new* GS interruptible transportation service did not leave

the status quo in place. Accomplishing that end would have required a remedy fashioned in a different manner: rejection of *both* the proposed revision to the full requirements provision *and* the GS exception in the IT rate schedule. The effect of the Commission's action, decoupling these proposals and accepting one while rejecting the other, was to impose a rate of its choosing for GS interruptible transportation.

B. *The Limit of the Commission's Authority Under § 4*

■ We must therefore determine whether the imposition of this new rate was within the scope of the Commission's authority. Section 4 contains clear language on this point:

> Whenever any such new schedule is filed the Commission shall have authority ... to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission ... may suspend the operation of such schedule and defer the use of such rate, charge, classification or service ... and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto *as would be proper in a proceeding initiated after it had become effective.*

15 U.S.C.A. § 717c(e) (1976) (emphasis added).

Surprisingly, although this court has on a number of occasions analyzed the scope of authority under § 4, and although the highlighted language clearly contains limits on the Commission's authority with respect to the issuance of orders after a § 4 determination that a proposed rate is unlawful, the limiting language has apparently been nowhere explicitly interpreted by a reviewing court. It seems plain nonetheless that the reference made by this part of the statute is to § 5. For § 5, it is well-established, *see Northern Natural Gas Co. v. FERC,* 827 F.2d 779, 781 (D.C.Cir.1987); *see also Sea Robin Pipeline Co. v. FERC,*

795 F.2d 182 (D.C.Cir.1986), is the section of the statute that governs "a proceeding initiated after [a rate] has become effective."

Section 5 defines the power of the Commission *after* it has reached a determination of unlawfulness as follows:

[T]he Commission *shall determine the just and reasonable rate,* charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.

15 U.S.C.A. § 717d (1976) (emphasis added). It is apparent that the *difference* between §§ 4 and 5 goes to the burden of proof on demonstrating that a proposed or existing rate, respectively, is unlawful.[10] Once this determination has occurred under *either* section, however, the *Commission* is required to reach a further determination: the just and reasonable rate to be fixed in place of either an unlawful proposed or existing rate. Thus it appears evident that the FERC has the authority to impose a new rate in a proceeding initiated under § 4 if the pipeline cannot carry its burden on its proposed rate *provided* that the FERC reaches the determination that the rate it seeks to impose is just and reasonable.

In a case substantially similar to the instant case, the FERC[11] reached the same interpretation under the Federal Power Act, 16 U.S.C.A. §§ 791a–828c (1985). In *Northern States Power Co. (Wisconsin),* 18 F.E.R.C. ¶ 63,022 (February 1, 1982), the ALJ rejected the power company's argument that

if this Commission should find [the rate schedule proposed for a new category of service] unjust and unreasonable the Commission should reject it but not redesign it to make it just and reasonable.

18 F.E.R.C. at 65,089. The ALJ interpreted the language—"a proceeding initiated after it had become effective"—in § 205(e)

of the Power Act to be a reference to § 206(a):

Whenever the Commission ... shall find that any rate ... is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.

16 U.S.C.A. § 824e(a) (1985). The Supreme Court has held that the Natural Gas Act and the Federal Power Act are "in all material respects substantially identical," *FPC v. Sierra Pacific Power Co.,* 350 U.S. 348, 353, 76 S.Ct. 368, 371, 100 L.Ed. 388 (1956) and constructions of one are authoritative for the other. *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577 n. 7, 101 S.Ct. 2925, 2930 n. 7, 69 L.Ed.2d 856 (1981). Thus the ALJ's interpretation, above, is equally applicable to the Natural Gas Act.

The Supreme Court has similarly interpreted identical language in the Interstate Commerce Act, 49 U.S.C.A. §§ 1–27 (1959) (§§ 1–23, 26a–27, repealed 1978), in connection with rail regulation. Section 15(7) of this Act provided that

after full hearing whether completed before or after the rate ... goes into effect, the commission may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective.

49 U.S.C.A. § 15(7) (1959) (repealed 1978). The Court held:

It seems too plain for argument that such broad authority is ample for the modification of either proposed or existing rates or both. The power granted the Commission under § 15(1) to deal with rates schedules already effective supports that view. For once the Commission finds the rate to be unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial or

---

**10.** A further difference between the two sections is that § 4 provides for suspension and refund, whereas § 5 does not. *See* 15 U.S.C.A. § 717c(e), 717d(a) (1976).

**11.** The initial decision of the Administrative Law Judge ("ALJ") in this case never became

the subject of a Commission review. Issues related to the case were settled subsequent to this decision. *See* Northern States Power Co. (Wisconsin), 20 F.E.R.C. ¶ 61,382 (September 20, 1982).

otherwise unlawful, the Commission is granted the power under § 15(1) to determine and prescribe the just and reasonable rate. The Commission is not bound either to approve or disapprove *in toto* the new rates that are proposed. It can modify the proposal in any respect and require that the proposed rates as modified or wholly different rates be substituted for the present ones.

*Ayrshire Collieries Corp. v. United States,* 335 U.S. 573, 582–83, 69 S.Ct. 278, 283–84, 93 L.Ed. 243 (1949).

This interpretation of the relationship between §§ 4 and 5 of the Natural Gas Act, that the power of the Commission with respect to remedying an unlawful rate whether proposed or existing is the same and is limited only by the requirement that it determine that the remedial rate prescribed is just and reasonable,[12] clarifies the construction of these sections by both the Supreme Court and this circuit. In *FPC v. Sierra Pacific Power Co., supra,* the Court observed [substituting the relevant sections of the Natural Gas Act for the equivalent sections in the Federal Power Act]:

> [t]he Commission has undoubted power under [§ 5] to prescribe a change in contract rates whenever it determines such rates to be unlawful.... If the proceedings here satisfied in substance the requirements of [§ 5], it would seem immaterial that the investigation was begun as one into the reasonableness of the proposed rate rather than the existing contract rates.

350 U.S. at 353, 76 S.Ct. at 371. Similarly, in connection with its review of the power of the Commission in conditioning certificates under § 7 of the Natural Gas Act, the Court has noted that "[i]t is true that the Act does not require a determination of just and reasonable rates in a § 7 proceed-ing *as it does in one under either § 4 or § 5."* *Atlantic Refining Co. v. Public Service Commission of New York,* 360 U.S. 378, 390, 79 S.Ct. 1246, 1254, 3 L.Ed.2d 1312 (1959) (emphasis added).

Recent decisions in this circuit are consistent with the same principle. *See Sea Robin Pipeline Co. v. FERC,* 795 F.2d 182, 183–84 (D.C.Cir.1986); *ANR Pipeline Co. v. FERC,* 771 F.2d 507, 513–14 (D.C.Cir. 1985); *Cities of Batavia, Naperville, Etc. v. FERC,* 672 F.2d 64, 75–77 (D.C.Cir.1982); *Public Service Commission of New York v. FERC,* 642 F.2d 1335, 1342–46 (D.C.Cir. 1980), *cert. denied,* 454 U.S. 879, 102 S.Ct. 360, 70 L.Ed.2d 189 (1981) (*Transco* ); *City of Willcox v. FPC,* 567 F.2d 394, 401–02 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978). *See also Northern Natural Gas Co. v. FERC,* 827 F.2d 779, 791 n. 44 (D.C.Cir.1987) (summarizing several of the above holdings). Each of these cases involved a rate review *initiated* by a pipeline filing proposed changes to *existing* rate schedules pursuant to § 4. The combined import of these cases is summarized in *Sea Robin:*[13]

> If the Commission enters upon a hearing concerning the lawfulness of a proposed rate increase, the pipeline bears the burden of proving that the rate sought is just and reasonable.... *Section 4 limits the Commission's authority to acceptance (in whole or in part) or rejection of the pipeline's proposed rates; the section does not authorize FERC to substitute rates of its own design for the rates proposed by the pipeline.* [Citation to *Transco.*] This restriction guarantees that rates generally will be set, in the first instance, by the pipelines themselves.... Section 5 of the Act ... empowers the Commission, in certain circumstances, to take the initiative in set-

---

**12.** There are further restrictions on the retroactive nature of remedial rates. *See* 15 U.S.C.A. §§ 717c(e), 717d(a) (1976).

**13.** The holding in *Batavia* addresses a slightly different aspect of §§ 4 and 5. We held there that the Commission had authority under § 4 to review "in tandem" the interaction between changed and unchanged parts of a revised rate schedule and to order refunds if the interaction produces an overrecovery of costs. 672 F.2d at 77. The remaining cases, *Sea Robin, ANR, Transco* and *Willcox,* deal with changes ordered to rate schedules in which no change was proposed or changes to existing provisions other than the changes proposed by the pipeline in initiating review.

ting rates. The Commission may order a pipeline to change to a specified new rate, either pursuant to a staff proposal or at the request of a third party, if FERC finds that the existing rate is unjust or unreasonable and the proposed new rate is both just and reasonable.... The proponent of the change-whether the Commission staff or a third party—bears the burden of proof under section 5. [Citation to *ANR Pipeline*.] If, in the course of a section 4 proceeding, FERC decides to take action authorized by section 5, the Commission may do so without initiating an independent proceeding.... But section 5 authority, regardless of the context in which it is exercised, may be pursued only in accordance with the requirements and constraints imposed by section 5.

795 F.2d at 183–84 (emphasis added).

Although the highlighted language read out of context might suggest no remedial authority at all in § 4, the purport of the full discussion is completely reconcilable with the statutory language empowering the Commission in § 4 to "make such orders ... as would be proper in a proceeding initiated after [a rate] had become effective," *i.e.*, § 5. All of the above cases involved remedial orders (which changed *existing* rates) in response to a finding that the pipeline's proposed rates were unlawful. Where existing rates are on file, it is clear, both prongs of the § 5 procedure are triggered if the order is to be one that "would be proper in a [§ 5] proceeding." Such an order must be supported by (1) a determination that the *presumptively* just and reasonable *existing* rate is no longer just and reasonable and (2) a determination that the alternative rate (alternative to both existing and proposed rates) that the Commission seeks to impose as a remedy is just and reasonable. Both of these prongs, whether arising in a remedial order for unlawful proposed rates under § 4 or a review of existing rates under § 5, are governed by the § 5 procedural requirement placing the burden of proof on the Commission.

## C. *Application of § 4 to the Commission's First Order*

In the instant case, the Commission was bound to satisfy both of these requirements before it could impose new rates on Tennessee. Here there was no *existing* rate for interruptible transportation for GS customers. Consequently, the first prong was irrelevant. Nonetheless, the Commission still bore the burden on the second prong, in imposing its remedial rate schedule governing transportation for GS customers at the regular IT rate, of showing that the remedy was just and reasonable.

As in the case where the Commission simply rejects a proposed change in an existing rate, the Commission's burden in justifying its remedial order would have been minimal if it had left intact the presumptively just and reasonable status quo: maintenance of the full requirements provision and the absence of a rate for GS interruptible transportation. However, the Commission fashioned a remedial order which altered the status quo; it thus brought upon itself the burden of affirmatively showing the lawfulness of such order.

The Commission styles the effective elimination of the full requirements provision as an acceptance of Tennessee's proposal; as such no burden would be raised for the Commission beyond exercise of its discretion to ensure that proposals are shown by the pipeline to be just and reasonable. This, however, mischaracterizes the modification proposed by Tennessee. Tennessee did not eliminate from its rate schedule the full-requirements condition that to qualify for the special one-part GS rate a customer must not "purchase gas direct from other suppliers." J.A. 19. Rather, it added an exception to this condition: customers would not violate the condition if they purchased gas from other suppliers but received such gas "by transportation service pursuant to Seller's Rate Schedule[ ] ... IT." *Id.* This modification did not eliminate the full-requirements condition. It did not, for example, relieve GS customers of the prohibition on establishing a second pipeline connection for purchasing gas

from suppliers other than Tennessee. It simply offered to transport gas purchased elsewhere at a specified rate: the GS–IT rate. Although Tennessee did not make explicit until its second filing (filed nine days after the Commission's first order) that it wished to transport for GS customers *only* at the GS–IT rate, and although the FERC is generally allowed to interpret filings according to their literal terms, it borders on the incredible in the circumstances of this case to interpret this filing, as the Commission did, as an independent proposal to eliminate the full requirements provision altogether.

Conversely, the GS one-part sales rate was designed to work in tandem with the full-requirements provision to recoup total demand charges sufficient to cover the fixed cost to Tennessee of providing firm sales. Tennessee did not propose to sever that relationship; rather, it proposed to modify it by continuing to collect the demand charge on each unit of gas that GS customers used (their full requirements). When the Commission (in exercising its policymaking discretion to require rates to be designed so as to recoup only costs attributable to the service provided) rejected this proposal and required transportation to be offered at the regular IT rate, it reduced the demand charges paid by GS customers below the existing presumptively just and reasonable level and below the level paid by other customers under a two-part rate design. This was a change wrought by the Commission's order. It was not a change that Tennessee proposed to make. The Commission cannot avoid its burden of demonstrating that its order is one which follows a "determin[ation of] the just and reasonable rate, charge, classification, rule, regulation, practice, or contract," 15 U.S.C. A. § 717d(a) (1976), simply by weaving its order from the tattered threads of Tennessee's proposal.

Tennessee never offered to demonstrate and the Commission never found that the modification to the sales rate schedule was just and reasonable in the absence of the proposed modification to the IT schedule. Indeed, modification of the sales rate schedule alone would have resulted in a reduction of GS demand charges below the level paid by all other firm sales customers on Tennessee's system; Tennessee directly argued the unlawfulness of such a discriminatory modification in both its second filing and its request for rehearing of the first order. *See* J.A. 64–67; 101–05. Unless it can be reasonably inferred from the record that there is substantial evidence to uphold a finding that a component of a pipeline's proposed rate schedule is just and reasonable standing alone, the use of that component in fashioning an order under § 4 does not relieve the Commission of the requirement of determining that the effect of such an order is just and reasonable.

There is not substantial evidence in the record before us to support the Commission's determination that it has here met this burden. The effect of the Commission's order was to impose on Tennessee an underrecovery of the fixed costs of providing firm sales to GS customers and to disturb the design of the special one-part GS sales rate so as to give these customers an ostensibly preferential demand charge. This was made evident to the Commission immediately by Tennessee both in its second filing in which it sought to prevent the decoupling of the GS–IT rate component from the full requirements component and in its arguments in support of its requests for rehearing of the Commission's first and second orders. On remand, the Commission must demonstrate substantial evidence to support its determination that the effect of its first order—arising from the changes in both the status quo GS Rate Schedule and IT Rate Schedule—is just and reasonable.

### D. *Rejection of Full Requirements*

Finally, we note that if the full requirements provision had still been in its historical place in the GS sales schedule as of the time of Tennessee's second filing, the Commission would have been required to bear the burden of proving that it was unlawful in order to justify its "rejection" of Tennessee's alternative proposal to maintain the provision in the event that the Commission again rejected the GS–IT rate. The record

before us would not provide substantial evidence to support our finding that the Commission had indeed borne this burden. The burden in such a case would be a significant one in light of the Commission's longstanding position that full requirements provisions are just and reasonable. "An agency changing its course ... is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first place." *Motor Vehicles Manufacturing Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). The prevalent use of such provisions in competitive as well as regulated industries and, most importantly, the Commission's own policy announcements in Order No. 436 and other adjudications add to the weight of the Commission's burden.

Contributing to our concern about the FERC's action here is our uncertainty about the breadth intended in its holding on full requirements. Read at its narrowest, the Commission's rehearing order holds that Tennessee's full requirements provision is unduly discriminatory solely because of the inappropriateness of the partial requirements rate schedule for GS customers.[14] The FERC says that, because the partial requirements rate schedule is designed for larger, higher-load customers, GS customers are effectively prevented from obtaining open-access transportation services if their only option is to switch from full to partial requirements. We would be hard-pressed, however, to find in the record as it now stands substantial evidence to support the Commission's burden of proof on this conclusion. The Commission cites no examples of GS customers that have been precluded from switching to the partial requirements schedule; nor does it adequately explain the basis for its predication that size and load factor will preclude switching. The Commission de-

votes greater attention to the fact that Tennessee's customers are captive customers, apparently to emphasize that if unable to switch to partial requirements, GS customers are precluded from transporting entirely for they cannot abandon Tennessee as their supplier. This fact on its own, however, obviously cannot be used to prove that the partial requirements rate is effectively unavailable to GS customers.

If, on the other hand, the FERC's discussion of the status of GS customers as captive customers is intended to provide an independent basis for proving that the full requirements provision is unlawful *per se*, regardless of the design of the partial requirements rate, then the burden of proof was certainly not met here by the Commission. While we are reluctant to infer that the Commission has used this oddly-poised opportunity to announce a *per se* prohibition on single-pipeline full requirements provisions with so little explanation, we are concerned that the rehearing order is susceptible of this interpretation and could operate in the future to prevent Tennessee from re-introducing a full requirements provision in connection with appropriate modifications to its partial requirements rate.[15]

In Order No. 436 the Commission clearly indicated that it had not determined that full requirements provisions are *per se* incompatible with the transformation of the natural gas industry into a more competitive market. In response to commentators who "argue[d] that full requirements contracts ... prevent a customer from making use of the transportation services offered by [Order No. 436]," the Commission responded:

> We agree with these commentators that to the extent full requirements contracts ... prevent a customer from making use of the rule's transportation services they are inconsistent with the [rule].... [A]

14. It is notable that this argument was not made in the FERC's second order in which it first rejected Tennessee's proposal to restore full requirements. There the FERC stated without elaboration that full requirements "would preclude GS customers from availing themselves of

open-access transportation services." 38 F.E.R.C. at 61,434.

15. Counsel for the FERC was unable to clarify at oral argument whether or not this broader interpretation was intended and whether or not the holding c¯uld have this effect in the future.

pipeline with sole supplier clauses ... [must] modify any existing contract terms that would prevent the reduction conversion. We do not necessarily agree, however, ... that customers that previously purchased under a full requirements rate should be allowed to continue to purchase under that rate schedule even though they no longer purchase their full requirements from the pipeline.... We can perceive no reason why a partial requirements customer should be allowed to purchase under the full requirements rate schedule.

50 Fed.Reg. at 42445. In supplemental comments on Order No. 436 the Commission elaborated on its treatment of full requirements in light of open-access. Noting that the "full requirements rate schedule is typically a more favorable rate schedule than a partial requirements rate schedule, in terms of the price that is paid for a unit of service," the Commission stated:

A customer that moves from a full requirements customer to a partial requirements customer ... may then use the next rate case as an opportunity to argue that the criteria for full requirements customers should be amended so that it could continue to take advantage of the full requirements rate schedules.

50 Fed.Reg. at 52241.

Subsequent FERC decisions have eliminated various forms of "full requirements" provisions; but the Commission has not cited any decision reaching the broad conclusion that where there is a single pipeline connection, full requirements provisions are *per se* violative of Order No. 436. In *Consolidated Gas Transmission Corp.,* 38 F.E.R.C. ¶ 61,150 (February 13, 1987), the Commission restated that Order No. 436

did not eliminate sole supplier contracts. Rather, it simply pointed out that the customers that are served under full requirements contracts may become subject to partial requirements rate sched-

ules when they exercise their reduction and conversion rights.

38 F.E.R.C. at 61,405. *Consolidated* dealt with staff objections to a settlement agreement which modified a full requirements provision to allow full requirements customers to continue to retain that status provided they either purchased from *or* transported their full requirements on Consolidated's pipeline. The Commission noted there that

Consolidated argues that the staff has failed to demonstrate that the sole supplier provisions are illegal *per se....* We agree.

*Id. Panhandle Eastern Pipe Line Co.,* 38 F.E.R.C. ¶ 61,164 (February 20, 1987), cited by the Commission in its rehearing order, concerned a sole-supplier provision in contracts with customers with *multiple* pipeline connections. Moreover, the rate schedules applicable to such customers contained ordinary two-part tariffs with separate demand charges; thus, Panhandle's sole supplier provision did not operate to allow the pipeline to recoup its demand costs. The Commission noted the importance of these features:

In eliminating Panhandle's sole-supplier provision we are not saying that all full requirements schedules are unacceptable. We note that there is a distinction between a full requirements rate schedule and Panhandle's sole supplier provision. We are only finding Panhandle's sole supplier clause to be unjust and unreasonable in this case. *The difference is this. Small general service full requirements rate schedules generally provide for volumetric rates with no demand charges.* Such full requirements rate schedules provide mutual obligations under which the supplier stands ready to provide the full requirements of the buyer, regardless of the level of those requirements, and the buyer agrees to take its full requirements from that supplier alone.[16]

---

**16.** Tennessee urged the court to find that it was the reciprocal obligation of the pipeline to provide *full* requirements that distinguished its case from *Panhandle.* Brief for Petitioner at 47. The Commission correctly argued that Tennes-

see's "full requirements" provision is really a "sole-supplier" provision in that it only obligates Tennessee to provide up to the contracted-for entitlement. Brief for Respondent at 34. Both Tennessee and the FERC, however, miss the

38 F.E.R.C. at 61,471 (emphasis added). *Panhandle* does not support the broad holding that the provision is unjust and unreasonable *per se*, particularly in light of the clear statements in Order No. 436 and other FERC cases to the contrary. In sum, whether the Commission's rationale is read broadly or narrowly, the Commission has not borne its burden of proof as to the unlawfulness of the full requirements provision this case.

### III. CONCLUSION

In conclusion, § 4 requires that a pipeline demonstrate that its proposed rate schedules are just and reasonable and that the Commission determine that any "rates, charges, classifications, rules, regulations, practices or contracts" fixed by the Commission after rejection of pipeline-proposed changes are just and reasonable. The Commission's determination that Tennessee's proposal to offer interruptible transportation to GS customers at the GS commodity rate is unjust and unreasonable is supported by substantial evidence. However, the FERC has failed to find that the rate schedule changes imposed by its first order are just and reasonable. In the absence of a valid determination that these changes are just and reasonable, the burden remains on the Commission to demonstrate the unlawfulness of Tennessee's full requirements provision. Consequently, the Commission's rejection in its second order of Tennessee's alternative proposal is not supported by substantial evidence unless the Commission determines that the changes made in its first order are just and reasonable. The case is remanded to the Commission for further proceedings consistent with this opinion.

---

meaning of the distinction set out in *Panhandle:* the reciprocal obligation that arises from the use of a one-part tariff which recoups demand costs only on the expectation that the customer will take its full requirements (up to its entitlement, perhaps) from a single pipeline.