871 F.2d 1099
 276 U.S.App.D.C. 359
 TENNESSEE GAS PIPELINE COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Orange and Rockland Utilities, Inc., The Berkshire Gas Co.,
et al., The Peoples Gas Light & Coke Co., National Fuel Gas
Supply Corporation, Columbia Gas Distribution Companies, The
Tennessee Small General Service Customer Group, Northern
Illinois Gas Co., Pennsylvania Gas and Water Co.,
Consolidated Gas Transmission Corp., The Inland Gas Co.,
Inc., The Cities of Clarksville, et al. Alabama-Tennessee
Natural Gas Co., Consolidated Edison Company of New York,
Inc., Shell Offshore Inc., et al., Long Island Lighting Co.,
Process Gas Consumers Group, Conoco Inc., Columbia Gas
Transmission Corporation, Texaco, Inc., Equitable Gas Co.,
Intervenors.
COLUMBIA GAS TRANSMISSION CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Orange and Rockland Utilities, Inc., The Berkshire Gas Co.,
et al., The Public Service Commission of the State of New
York, Tennessee Gas Pipeline Co., Columbia Gas Distribution
Companies, National Fuel Gas Supply Corporation, The
Tennessee Small General Service Customer Group, Northern
Illinois Gas Co., Pennsylvania Gas and Water Co., The Inland
Gas Co., Inc., The Cities of Clarksville, et al., Texaco
Inc., Alabama-Tennessee Natural Gas Co., Conoco Inc., Shell
Offshore Inc., et al., Consolidated Gas Transmission Corp.,
Union Oil Co. of California, Intervenors.
TENNESSEE GAS PIPELINE COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Orange and Rockland Utilities, Inc., The Berkshire Gas Co.,
et al., The Public Service Electric and Gas Co., The Peoples
Gas Light and Coke Co., Equitable Gas Company, Long Island
Lighting Company, Consolidated Edison Company of New York,
Inc., Process Gas Consumers Group, Intervenors.
 Nos. 87-1368, 87-1374 and 88-1075.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 25, 1989.
Decided March 10, 1989.
 
 Ronald N. Carroll, with whom Giles D.H. Snyder and Stephen J. Small, Charleston, W.Va., were on the brief, for Columbia Gas Transmission Corp., petitioner in No. 87-1374 and intervenor in No. 87-1368.
 Robert H. Benna, with whom Terence J. Collins, Washington, D.C., Margaret L. Bollinger, Houston, Tex., Harold L. Talisman and David D. Withnell, Washington, D.C., were on the brief, for Tennessee Gas Pipeline Co., petitioner in Nos. 87-1368, 88-1075 and intervenor in No. 87-1374.
 Stanley M. Morley, Washington, D.C., for intervenor, Alabama-Tennessee Natural Gas Co., in Nos. 87-1368, 87-1374.
 Dale A. Wright, Washington, D.C., also entered an appearance for petitioner in Nos. 87-1368, 88-1075.
 Michael E. Small, Washington, D.C., also entered an appearance for petitioner in No. 87-1368.
 Kenneth M. Ende, Atty., F.E.R.C., with whom Catherine C. Cook, Gen. Counsel, F.E.R.C., and Joseph S. Davies, Deputy Sol., F.E.R.C., Washington, D.C., were on the brief for respondent in Nos. 87-1368, 87-1374, 88-1075.
 Dwight Alpern, Washington, D.C., also entered an appearance for respondent in Nos. 87-1368, 87-1374, 88-1075.
 Jerome M. Feit, Washington, D.C., also entered an appearance for respondent in No. 88-1075.
 Richard A. Solomon, New York City, and David D'Allesandro entered appearances for intervenor, The Public Service Com'n of the State of New York, in Nos. 87-1368 and 87-1374.
 Harry H. Voigt and Mindy A. Buren, Washington, D.C., entered appearances for intervenor, Orange and Rockland Utilities, Inc., in Nos. 87-1368, 87-1374, 88-1075.
 John W. Glendening, Jr. and Bruce B. Glendening, Washington, D.C., entered appearances for intervenor, The Berkshire Gas Co., et al., in Nos. 87-1368, 87-1374, 88-1075.
 Thomas M. Patrick, Chicago, Ill., and Karen Lee entered appearances for intervenor, The Peoples Gas Light and Coke Co., in Nos. 87-1368, 88-1075.
 George L. Weber, Washington, D.C., entered an appearance for intervenor, National Fuel Gas Supply Corporation, in Nos. 87-1368, 87-1374.
 John L. Shailer and Roger C. Post, Columbus, Ohio, entered appearances for intervenor, Columbia Gas Distribution Companies, in Nos. 87-1368, 87-1374.
 Michael J. Manning, James F. Moriarty and James P. White, Washington, D.C., entered appearances for intervenor, The Tennessee Small General Service Customer Group, in Nos. 87-1368, 87-1374.
 David I. Bloom, Andrew J. Pincus, Washington, D.C., and Wendell H. Adair, Jr., Chicago, Ill., entered appearances for intervenor, Northern Illinois Gas Co., in Nos. 87-1368, 87-1374.
 Glenn W. Letham and Kenneth M. Albert, Washington, D.C., entered appearances for intervenor, Pennsylvania Gas and Water Co. in Nos. 87-1368, 87-1374.
 Mark G. Magnuson, Washington, D.C., entered an appearance for intervenor, Consolidated Gas Transmission Corp., in No. 87-1368.
 L. Michael Bridges, Wilmington, Del., entered an appearance for intervenor, The Inland Gas Co., Inc., in Nos. 87-1368, 87-1374.
 James R. Choukas-Bradley, Washington, D.C., entered an appearance for intervenor, The City of Clarksville, et al., in Nos. 87-1368, 87-1374.
 Paul W. Diehl, Springfield, Va., entered an appearance for intervenor, Alabama-Tennessee Natural Gas Co., in Nos. 87-1368, 87-1374.
 William I. Harkaway, Harvey L. Reiter, Washington, D.C., and Barbara M. Gunther, New York City, entered appearances for intervenor, Consolidated Edison Co. of New York, Inc., in Nos. 87-1368, 88-1075.
 Thomas G. Johnson, Houston, Tex., entered an appearance for intervenor, Shell Offshore Inc., et al., in Nos. 87-1368, 87-1374.
 James J. Stoker, III, Arnold H. Quint and James F. Bowe, Jr., Washington, D.C., entered appearances for intervenor, Long Island Lighting Co., in Nos. 87-1368, 88-1075.
 Edward J. Grenier, Jr., William H. Penniman and James M. Bushee, Washington, D.C., entered appearances for intervenor, Process Gas Consumers Group, in Nos. 87-1368, 88-1075.
 Carolyn S. Hazel, Houston, Tex., J. Paul Douglas and George C. Garikes entered appearances for intervenor, Conoco Inc., in Nos. 87-1368, 87-1374.
 
 
 1
 Mickey Jo Lawrence entered an appearance for intervenor, Texaco Inc., in No. 87-1374.
 
 
 2
 Albert Sylvia, III, Los Angeles, Cal., entered an appearance for intervenor, Union Oil Co. of California, in No. 87-1374.
 
 
 3
 James R. Lacey, Newark, N.J., entered an appearance for intervenor, Public Service Elec. and Gas Co., in No. 88-1075.
 
 
 4
 Gary E. Guy, Arlington, Va., entered an appearance for intervenor, Equitable Gas Co., in No. 88-1075.
 
 
 5
 Before WALD, Chief Judge, and MIKVA and SENTELLE, Circuit Judges.
 
 
 6
 Opinion for the court filed by Chief Judge WALD.
 
 WALD, Chief Judge:
 
 7
 As part of its efforts to increase competition in the natural gas market, the Federal Energy Regulatory Commission ("FERC" or "Commission") has made it increasingly difficult for pipelines to maintain minimum bill provisions in their tariffs. A minimum bill requires a pipeline's customer to pay some of the charges for a percentage of the gas reserved, whether or not the customer actually purchases that quantity.[1] Petitioner Tennessee Gas Pipeline Co. ("Tennessee") objects to the Commission's decision to eliminate its minimum bill. Petitioner Columbia Gas Transmission Corp. ("Columbia"), one of Tennessee's customers, objects to the effective date set by the Commission for eliminating the minimum bill. We affirm the Commission on the merits of its minimum bill decision and on the effective date of that decision. We also determine that the Commission has reasonably interpreted Sec. 19 of the Natural Gas Act, 15 U.S.C.A. Sec. 717r (1976), to allow the Commission to modify a prior order so as to correct an error in the effective date that was not identified in a timely petition for rehearing. We find as well that Columbia was not required to file a new petition for rehearing to preserve the arguments it raised in its petition for rehearing of the prior effective date even though the date was subsequently modified, but that any new arguments should have been raised in a new petition.
 
 
 8
 Tennessee raises an additional challenge to FERC's decision to alter the rate classification of storage costs incurred at Tennessee's Bear Creek storage facility. Tennessee raised this challenge in two petitions for rehearing: first, after the original order making the change issued and second, after the Commission rejected Tennessee's compliance filings for failure to include the change in its tariff. We conclude that we have no jurisdiction to consider the new arguments Tennessee raised in its second petition for rehearing of the decision to reject the compliance filings and accordingly we dismiss the appeal from that rejection. On the merits of the Bear Creek classification itself, properly before the court as a consequence of Tennessee's first petition for rehearing, we find that the Commission failed to provide an adequate explanation for its new treatment of these costs and we remand for further proceedings on this issue.
 
 I. PROCEDURAL HISTORY
 
 9
 This case was initiated by Tennessee's new rate filing under Sec. 4 of the Natural Gas Act, 15 U.S.C.A. Sec. 717c (1976). The filing raised numerous issues, including the proper design of Tennessee's rates, the lawfulness of Tennessee's minimum bill (Tennessee had proposed no changes in this longstanding provision of its rates) and the appropriate treatment of the storage costs at Tennessee's Bear Creek storage facility. Tennessee reached a settlement with its customers and FERC (the November 1983 settlement or "1983 settlement") which disposed of many issues, established a hearing before an Administrative Law Judge ("ALJ") to hear the merits of, inter alia, the rate design, minimum bill and Bear Creek issues, and set out "interim methods" for treating these issues which were to be implemented pending the outcome of the hearing.[2] This agreement included a provision which required any changes in the minimum bill ordered as a result of the litigation to be made effective prospectively from the date of a final Commission order.
 
 
 10
 In 1984 the ALJ issued her decision, finding that Tennessee should adopt a modified fixed-variable ("MFV") rate design[3], that Tennessee's minimum bill should be eliminated, and that Tennessee's treatment of Bear Creek costs as demand costs[4] was justified. The Commission affirmed the ALJ on the MFV and minimum bill issues but reversed on the treatment of Bear Creek storage costs, ordering that they be treated as commodity costs and put in the commodity charge,[5] in Opinion No. 249, 36 F.E.R.C. p 61,071 (1986) ("Opinion No. 249" or "first order"). The Commission ordered Tennessee to implement the changes set out in Opinion No. 249 on September 1, 1986. Tennessee petitioned for rehearing of the decision to eliminate the minimum bill and to classify Bear Creek costs to the commodity charge. After the thirty-day period for rehearing had run, Tennessee filed a further "Motion for Clarification" asking FERC to "clarify" the effective date by which the minimum bill had to be eliminated, i.e., that it need be eliminated only after the Commission's final order on rehearing had issued. Columbia also petitioned for rehearing of Opinion No. 249, arguing that the minimum bill should be eliminated retroactively instead of on September 1, 1986.
 
 
 11
 The Commission denied both Tennessee's and Columbia's petitions for rehearing in Opinion No. 249-A, Tennessee Gas Pipeline Co., 40 F.E.R.C. p 61,140 (1987) ("rehearing order"), confirming its prior decision on the merits of the minimum bill and Bear Creek issues. However, the Commission treated Tennessee's Motion for Clarification as a Motion for Reconsideration and granted it, finding that the November 1983 settlement agreement unambiguously required FERC to delay elimination of the minimum bill until after rehearing, thus changing the effective date to August 1, 1987. The Commission rejected Columbia's arguments that the settlement agreement had expired or in any case was too ambiguous to compel the Commission's choice of an effective date, along with Columbia's affirmative position that the minimum bill should be eliminated retroactively. Columbia did not file a petition for rehearing of the Commission's rehearing order.
 
 
 12
 Tennessee and Columbia filed timely appeals of Opinion No. 249, contesting the minimum bill and effective date issues and the Commission's classification of the Bear Creek costs to the commodity charge. Tennessee then filed a further appeal in which it sought review of the Commission's subsequent rejection of Tennessee's compliance filings, which failed to put Bear Creek costs into the commodity charge.II. MINIMUM BILL
 
 
 13
 Tennessee raises a host of reasons why the Commission's elimination of its minimum bill should be reversed. Most of these arguments have already been extensively addressed by this court in East Tennessee Natural Gas Co. v. FERC, 863 F.2d 932, 935-940 (D.C.Cir.1988); see also Transwestern Pipeline Co. v. FERC, 820 F.2d 733 (5th Cir.1987), cert. denied --- U.S. ----, 108 S.Ct. 696, 98 L.Ed.2d 648 (1988), and we will not repeat those discussions here. In particular, this court has already determined that FERC has acted reasonably in concluding that minimum bills are anticompetitive and therefore prima facie unlawful under Sec. 5 of the Natural Gas Act, 15 U.S.C.A. Sec. 717d; we concluded in East Tennessee that it is therefore appropriate for the Commission to shift the burden to the pipeline of producing evidence showing that the minimum bill meets at least one of the three justifications set out in Atlantic Seaboard, 38 F.P.C. 91 (1967), aff'd, 404 F.2d 1268 (D.C.Cir.1968). The Commission, however, always retains the ultimate burden of proving that an existing minimum bill which the pipeline has not itself proposed to change is unlawful. 863 F.2d at 937-38.
 
 
 14
 A minimum bill is justified under the first Seaboard justification if it is necessary to prevent underrecovery of the pipeline's fixed costs.[6] We found in East Tennessee that a pipeline that had proposed to switch to the MFV rate design, which places all of the pipeline's fixed costs except for a return on equity and related income taxes into a demand charge, could not justify its minimum bill on the basis of the first Seaboard justification. 863 F.2d at 939-40. With MFV, the pipeline is guaranteed recovery of all of its fixed costs except for equity return and taxes; equity return and taxes can be recouped only to the extent that the pipeline actually sells gas. The Commission found that exposing equity return to risk provided an appropriate incentive for pipelines to behave competitively. On the basis of East Tennessee, then, we reject Tennessee's arguments under the first Seaboard justification. Tennessee's arguments on the second and third justifications, however, deserve more extensive treatment.
 
 
 15
 The second Seaboard justification arises out of equity concerns. Tennessee, like most pipelines, has both full and partial requirements customers. Full requirements customers, generally small local distribution companies which have no alternative source of supply, purchase all of their natural gas needs from Tennessee. Partial requirements customers, on the other hand, are capable of purchasing gas from other pipelines; consequently, they may "swing" off the Tennessee system in order to purchase gas elsewhere if Tennessee's prices are unattractive, a practice encouraged by the Commission's efforts to increase competition in natural gas sales. When these customers swing, however, the volumes of gas sold by Tennessee drop.
 
 
 16
 The second Seaboard justification seeks to prevent too precipitous drops in volume that can cause an unfair proportion of fixed costs to be shifted from partial to full requirements customers. Essentially, if Tennessee is selling fewer units of gas, then each unit of gas sold must make a larger contribution to the recovery of the pipeline's fixed costs. Accordingly, the price per unit of gas (reserved and/or delivered) increases and full requirements customers, which have no option but to purchase from Tennessee, must pay these higher prices. A minimum bill requires a partial requirements customer to pay a portion of the pipeline's charges regardless of how much is taken and therefore ensures that these customers continue to contribute to fixed costs even when they reduce their actual takes; this obviates the need for higher prices. In addition, the minimum bill, by discouraging swings (since the customer must pay Tennessee a charge for gas even if the gas is purchased from another supplier), can prevent drops in volume in the first place.
 
 
 17
 Under the procedure established in Transwestern Pipeline Co., supra, and approved by this court in East Tennessee, Tennessee was required to produce evidence to show that excessive cost-shifting would occur on its system in the absence of a minimum bill.[7] The Commission found that Tennessee had failed to sustain this burden. As explained in its order denying rehearing, FERC will not
 
 
 18
 approve a minimum bill simply because there exists the slightest possibility that some costs will be shifted to full requirements customers.... To balance these conflicting interests the initial questions that must be answered are: Will the full requirements customers be affected by the partial requirements customer's decision? If so, by how much? These questions are intensely factual. They turn on the resolution of such subsidiary questions as: Will the partial requirements customer in fact reduce its purchases? If so, by how much? Will the reduction be short-term or long-term? Will the pipeline reduce its costs to compete for the partial requirements customer? And, will the pipeline increase sales to other customers be they existing or new?
 
 
 19
 Tennessee Gas Pipeline Co., 40 F.E.R.C. p 61,140 at 61,437 (1987) (quoting Transwestern Pipeline Co., 36 F.E.R.C. p 61,175, 61,445). Tennessee presented no evidence on these factual questions. The only evidence presented to the ALJ consisted of a hypothetical situation advanced by one of Tennessee's customers, East Tennessee (a Tennessee subsidiary), positing the amount of cost-shifting that would occur if Tennessee lost all of its partial requirements sales, an amount equal to 72% of Tennessee's total sales volume. The Commission rejected this hypothetical as "highly speculative" and we agree. Thus, having failed to produce any concrete evidence of cost-shifting among its customers,[8] Tennessee did not return the burden to the Commission to prove that such shifting did not warrant a minimum bill, and the Commission acted reasonably in rejecting the second Seaboard justification.
 
 
 20
 The third Seaboard justification focuses on "take-or-pay" liabilities incurred by pipelines on their own supply contracts. Tennessee enters into long-term contracts with its suppliers in order to meet its obligation to supply the needs of its customers. These contracts contain "take-or-pay" clauses which require Tennessee to pay for a minimum amount of gas whether or not it is actually taken. (Payments for gas not taken can sometimes be treated as prepayments for future gas purchases.) When Tennessee's customers reduce their purchases, Tennessee's own takes under supplier contracts fall, potentially causing Tennessee to incur take-or-pay costs. A minimum bill can be justified under the third Seaboard justification if it links cost-incurrence with cost-causation, i.e., if it assists in collecting take-or-pay costs from those customers that have caused the costs by reducing their purchases.
 
 
 21
 The Commission found that Tennessee's minimum bill was not justified for take-or-pay reasons. The Commission found that
 
 
 22
 there is no connection between the minimum bill payments the customers would make and the carrying costs associated with take-or-pay liabilities Tennessee could recover from them. Moreover, ... Tennessee's own witnesses did not assert any relationship between take-or-pay obligations and its minimum bill, and were unable to single out specific customers who cause the incurrence of prepayments.
 
 
 23
 40 F.E.R.C. p 61,140 at 61,437 (1987). In response Tennessee argues that the Commission's action is unlawful because it fails to come to grips with the basic fact that Tennessee is potentially exposed to great take-or-pay liability as a result of the Commission's efforts to increase competition in the industry and that the minimum bill, although not directly linking cost incurrence with cost causation, is nonetheless necessary in order for Tennessee's overall rate structure to be just and reasonable. Cf. Tennessee Gas Pipeline Co. v. FERC, 860 F.2d 446 (D.C.Cir.1988) (Commission must ensure that any changes it initiates under Sec. 5 of Natural Gas Act result in a just and reasonable rate structure.)
 
 
 24
 Tennessee's concern is not an insubstantial one. In Associated Gas Distributors v. FERC, 824 F.2d 981 (D.C.Cir.1987), cert. denied sub nom. Interstate Natural Gas Association v. FERC, --- U.S. ----, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988), this court vacated the provisions of FERC's historic Order No. 436, 50 Fed.Reg. 42,408 (1985), in which it took decisive steps to restructure the natural gas industry along more competitive lines, because of, inter alia, FERC's "insouciance on take-or-pay." 824 F.2d at 1044. FERC's elimination of Tennessee's minimum bill is part and parcel of the same drive to increase competition in the industry that was signalled by Order No. 436. Yet the Commission's discussion of the take-or-pay issue in this case is disturbing in its narrow technical focus on the fact that minimum bills are an imperfect mechanism for tracking the source of take-or-pay liability. The bigger picture strongly suggests that the specter of take-or-pay obligations does hinder pipelines from pursuing the competitive course charted by FERC and requires them to devise some pricing strategy for recoupment when demand falls.
 
 
 25
 Our concern about FERC's unwillingness to meet the take-or-pay challenge head-on in this case is, however, relieved by its actions in other proceedings. FERC has recently issued Order No. 500, 52 Fed.Reg. 30,334 (1987), appeal pending sub nom. American Gas Association v. FERC, No. 87-1588 (D.C.Cir. filed October 19, 1987), in which the Commission recognizes that "[t]he causes of the pipelines' take-or-pay problems are many and complex." 52 Fed.Reg. at 30,337. Order No. 500 establishes a number of mechanisms whereby take-or-pay liability can be reduced and take-or-pay costs allocated equitably among customers. Relevant to Tennessee's case, the order provides for a method of tracking the customer sources of take-or-pay liability more closely than does the minimum bill. Under the rate principles in Order No. 500 Tennessee could settle its take-or-pay obligations (a "buy-down" or "buy-out" of its long-term contracts) and then pass on 50% of the settlement costs to customers in a demand surcharge based on a customer's "cumulative deficiency of purchases in recent years measured in relation to that customer's purchases during a representative base period prior to the accrual of take-or-pay liabilities." Id. at 30,341. FERC would require the pipeline to absorb 50% of the settlement cost in recognition of the fact that the pipeline contributed to the take-or-pay problem by entering into uneconomic long-term contracts. Customers in turn would bear their share of the consequences in recognition of the fact that the contracts were entered into to enable the pipeline to live up to its customer supply commitments.
 
 
 26
 Significantly, the Commission noted in Order No. 500 that "[t]he minimum commodity bill was an attempt to deal with this problem [of charging customers for the costs incurred by the pipeline in standing ready to provide service], but its design did not work well as competition increased.... The principles underlying [Order No. 500] are intended to remedy this problem." Id. at 30,346 n. 22. It thus appears that the Commission intends in Order No. 500 to address the problem of take-or-pay directly; we suspect the third Seaboard justification will retain little vitality in the future. In light of the options available to Tennessee under Order No. 500,[9] we find nothing unlawful about the Commission's conclusion that the minimum bill is not "actually necessary to protect the [pipeline] and its customers from too painful a 'pinch' of unrestrained competition and [not] specifically designed to do so." Mississippi River Transmission Corp. v. FERC, 759 F.2d 945, 950 (D.C.Cir.1985).[10] We therefore conclude that the Commission acted reasonably in eliminating Tennessee's minimum bill.
 
 
 27
 III. EFFECTIVE DATE OF MINIMUM BILL ELIMINATION
 
 
 28
 In Opinion No. 249, issued on July 22, 1986, the Commission ordered Tennessee to file revised tariffs within thirty days, eliminating the minimum bill effective September 1, 1986. Tennessee filed a timely petition for rehearing of this order, which included a request that the Commission stay the elimination of the minimum bill. Two weeks after the thirty-day period for rehearing petitions had run, Tennessee filed a further "Motion for Clarification" in which it requested that FERC "clarify" its order to indicate that the elimination of the minimum bill would not take place until after an order denying rehearing had issued from the Commission, in compliance with the terms of the November 1983 settlement agreement. The Commission treated this "Motion for Clarification" as a "Motion for Reconsideration" and in its order denying rehearing modified the first order so as to conform the effective date to the settlement agreement, i.e., eliminating the minimum bill as of August 1, 1987. Columbia argues that the Commission had no authority to modify the prior order because Tennessee failed to identify the error in a timely petition for rehearing.[11]
 
 A. Finality: Interpreting Sec. 19
 
 29
 The Natural Gas Act requires that a person aggrieved by a Commission order file a petition for rehearing within thirty days of the order; the courts are without jurisdiction to review any order unless such a petition has been timely filed. Moreover, "[n]o objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do." 15 U.S.C.A. Sec. 717r (1976). These rehearing requirements are express statutory limitations on the jurisdiction of the courts and neither we nor the Commission have authority to relax them. Boston Gas Co. v. FERC, 575 F.2d 975, (1st Cir.1978). The question in this case, however, is not one of our jurisdiction to review the Commission's order on request of a party who has failed to seek rehearing but rather one of the Commission's authority to act sua sponte to reconsider and change a portion of an order that has not been challenged in a timely petition for rehearing.[12]
 
 
 30
 The Commission relies on Sec. 19 for its authority to modify a prior order sua sponte. In relevant part that section reads:
 
 
 31
 Until the record in a proceeding shall have been filed in a court of appeals, as provided in [subsection addressing jurisdiction of court of appeals], the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.
 
 
 32
 15 U.S.C.A. Sec. 717r(a) (1976). Courts have held that this language confers upon the Commission the authority "to reconsider and correct its order until the time for judicial review has expired. [This] power to correct an order remains with the Commission until such time as the record on appeal has been filed with a court of appeals or the time for filing a petition for judicial review has expired." Pan American Petroleum Corp. v. FPC, 322 F.2d 999, 1004 (D.C.Cir.1963) (citations omitted). Since timely petitions for rehearing of Opinion No. 249 had been filed with the Commission and the time for judicial review had not expired, the only question we face is whether the holding in Pan Am is restricted to the facts of that case,[13] i.e., whether the Commission may act on its own motion to consider arguments not raised in a timely petition for rehearing.
 
 
 33
 We see no reason to disagree with the Commission that its authority to modify an order is not so limited. Virtually the same language in other statutes has been consistently interpreted as granting the agency power to modify any aspect of an order at any time until an appeal has been filed.[14] The Supreme Court has so construed similar language in the Federal Trade Commission Act and the National Labor Relations Act. International Union of Mine, Mill and Smelter Workers v. Eagle-Picher Mining and Smelting Co., 325 U.S. 335, 65 S.Ct. 1166, 89 L.Ed. 1649 (1945). Although the Court there was faced with the precise question of when the NLRB's authority to modify an order setting a formula for the calculation of back pay expired, the changes having been made after the order had been affirmed on appeal and the parties had "tendered the amount they ascertained to be due thereunder," 325 U.S. at 337, 65 S.Ct. at 1167, the Court's construction of the governing statute left little doubt that "[u]ntil the transcript of a case is filed in court, the Board may, after reasonable notice, modify any finding or order in whole or in part." The Act "specifically gives the Board wide powers of modification.... There is no dearth of discretion or opportunity for its exercise." Id. at 341, 65 S.Ct. at 1169.[15]
 
 
 34
 The relevant part of Sec. 19 of the Natural Gas Act was added in the course of amendments to several statutes designed, inter alia, to clarify when the jurisdiction of an agency to modify its orders ended and when that of the court of appeals began. Pub.L. 85-791, 72 Stat. 941; see S.Rep. No. 2129, 85th Cong., 2d Sess. (1958). The added language clearly tracked the language already in place in such statutes as the Federal Trade Commission Act and the National Labor Relations Act; but Congress made no specific comment on the substantive effect of the added language. In light of the Supreme Court's interpretation of the same language in Eagle-Picher, we find the Commission's interpretation of Sec. 19 here to be reasonable. See Chevron U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-845, 104 S.Ct. 2778, 2781-2783, 81 L.Ed.2d 694 (1984) (court must defer to reasonable agency interpretation of statute in the absence of clear congressional intent). We find that the Commission acted within its Sec. 19 authority when it modified its first order on reconsideration.[16]
 
 B. Jurisdiction
 
 35
 Columbia raises a battery of arguments as to why the effective date of the elimination of the minimum bill should be changed. Columbia had originally protested the September 1, 1986 date, arguing in its petition for rehearing that the settlement agreement had expired December 31, 1985, thus freeing the Commission to choose the effective date. Columbia also argued that even if nominally binding, the settlement agreement was ambiguous and should not be read to prevent the Commission from exercising its remedial authority to craft a just and reasonable rate order. Relying on these arguments, Columbia sought first to have the minimum bill eliminated retroactively;[17] since the Commission delayed elimination until August 1, 1987, Columbia now relies on these same arguments for moving the date back, minimally, to September 1, 1986. In addition, Columbia raises a new argument that the Commission is required by the Natural Gas Act to eliminate the minimum bill as of the date it first found the bill unlawful, i.e., September 1, 1986.
 
 
 36
 Tennessee argues that Columbia is now barred from raising challenges to the effective date because Columbia did not petition for rehearing of the modification. Courts construe the jurisdictional rehearing requirements of Sec. 19 strictly. See ASARCO, Inc. v. FERC, 777 F.2d 764 (D.C.Cir.1985). As we have already explained, Sec. 19 permits judicial review of "an order" only if both a timely petition for rehearing of "such order" was filed with the Commission and any objections raised with the court were included in the petition. This latter requirement can be relaxed only if "there is reasonable ground for failure" to so raise all objections. 15 U.S.C.A. Sec. 717r(b).
 
 
 37
 Most of Columbia's objections to the effective date of September 1, 1986, raised in its timely petition for review, were equally valid as objections to August 1, 1987 and form the bulk of Columbia's appeal to the court. Columbia therefore properly preserved its right to raise these arguments to the court; the change in the Commission's order did not alter their substance. The change did, however, give rise to the wholly new objection that the Commission lacks authority to enter into settlement agreements which delay elimination of a rate provision beyond the date on which the provision is found unlawful, in this case, September 1, 1986.
 
 
 38
 Columbia, of course, did not raise this objection in its petition for rehearing because at the time it filed that petition the effective date was September 1, 1986. But in order for the court to now consider this argument, Columbia would have to show reasonable cause why it did not raise the objection to the Commission; it could easily have done so by filing a second petition for rehearing which treated the modification order as a new order.[18] As it is, the Commission had no opportunity to assess the objection and neither FERC nor other parties were adequately apprised of it.[19] It is of course a fine point to determine whether a subsequent modification amounts to a new order or is merely a technical change of an existing order. In light of the Natural Gas Act's "virtually unheard-of" "mandatory petition-for-rehearing requirement, with or without the additional requirement of raising the very objection urged on appeal," ASARCO, 777 F.2d at 774, however, we think that if Columbia wished to treat the modification as a minor one and rely on its first petition for rehearing, it was as a consequence constrained to stick with the objections previously raised to the Commission. We have jurisdiction to consider only such objections.
 
 C. Merits
 
 39
 On the merits, Columbia's challenge to the effective date comes down to whether the 1983 settlement agreement, stating that changes in the minimum bill were to be made prospectively only from the date of a final Commission order on the bill, either expired or was sufficiently ambiguous to permit the Commission to exercise its discretion in setting the effective date for elimination of the bill.[20] The Commission found the agreement valid and binding on the effective date issue. We see no reason to disturb the Commission's decision.[21] The 1983 settlement established hearing procedures before an ALJ to resolve, inter alia, the merits of the minimum bill issue. The agreement provided that "[w]ithin thirty days following the date upon which the Commission's decision on each of the issues which are being litigated [including the minimum bill] becomes final, Tennessee shall file revised tariff sheets reflecting ... tariff changes required to implement the Commission's decision on the pertinent litigated issue." J.A. 105 (emphasis added). The agreement defined "final" to mean the date of the Commission order denying all petitions for rehearing. The Commission found no ambiguity in this language, nor do we.
 
 
 40
 Columbia argues next, however, that the terms of the 1983 settlement expired on December 31, 1985. It relies not on any explicit expiration clause, but on the agreement's provision that Tennessee was free after December 31, 1985, to make new rate filings, which did not reflect the "interim methods" that the agreement otherwise required Tennessee to implement pending resolution of the litigation before the ALJ. But it strains commonsense construction of the contract to suppose that by freeing Tennessee to make new proposals for rate methods in a later filing, the parties intended to scuttle the ongoing litigation over the minimum bill. Rather, we believe, the provision in the settlement agreement requiring implementation of the outcome of that litigation as of the date of a final Commission order survived naturally along with the ongoing proceedings leading up to such an order.[22] Columbia's contrary interpretation is unpersuasive and we uphold the Commission's determination that the minimum bill provisions did not expire as of December 31, 1985. Consequently, Columbia's argument that the Commission erred in complying with the clear terms of those provisions, eliminating the minimum bill as of the Commission's final order, i.e., August 1, 1987, self-destructs.
 
 IV. BEAR CREEK STORAGE COSTS
 
 41
 Tennessee raises a separate challenge to another issue resolved in the same proceedings that dealt with the minimum bill. Prior to those proceedings, Tennessee passed the storage costs incurred at the Bear Creek facility on to its customers "as-billed"; that is, since Bear Creek charged Tennessee a flat demand charge for use of the facility, Tennessee in turn included the Bear Creek costs in the demand charge collected from its customers.[23] The Commission ordered Tennessee to reclassify Bear Creek costs from the demand charge to the commodity charge. Tennessee did not make this change in the filings it supplied to implement the Commission's order; the Commission then refused to accept the filings for noncompliance.
 
 A. Jurisdiction
 
 42
 We face yet another jurisdictional issue. Tennessee petitioned the court (in Docket No. 87-1368) for review of the Commission's order denying rehearing of Opinion No. 249. Tennessee also petitioned the court (in Docket No. 88-1075) for review of the Commission's order denying rehearing of FERC's rejection of Tennessee's compliance filings. Both petitions challenged the Commission's decision to require reclassification of the Bear Creek storage costs. The Commission has asked us to dismiss the latter petition because it is a collateral attack on Opinion No. 249; doing so, however, would limit Tennessee to those objections to the Bear Creek decision that it raised in its original petition for rehearing of Opinion No. 249.
 
 
 43
 Tennessee responds that it was entitled to defer its appeal of the Bear Creek decision until its compliance filings were rejected, because Opinion No. 249 was ambiguous and did not clearly order reclassification. While we agree that the Commission's order was ambiguous and Tennessee might have been justified in interpreting it not to require reclassification, in actuality Tennessee waived that right by asking in its petition for rehearing of Opinion No. 249 that the Commission either clarify the first order so as not to require reclassification or "so hold on rehearing". J.A. 404 (emphasis added). The Commission revisited the issue on rehearing, although again its holding was unclear. Tennessee then filed its compliance filings without making any change in the Bear Creek classification.
 
 
 44
 Tennessee's later petition for rehearing of the Commission's decision to reject the compliance filings appears to be an effort to raise new arguments in support of its challenge to the original Bear Creek decision that were not raised in its first petition for rehearing.[24] There are no arguments in its second petition that Tennessee could not have articulated the first time around. Thus Tennessee was not harmed by the ambiguity in the Commission's order and there is no "reasonable ground for [Tennessee's] failure," 15 U.S.C.A. Sec. 717r(b), to have raised all its objections in its first petition for rehearing. Consequently, we dismiss Tennessee's petition appealing the rejection of its compliance filings (Docket No. 88-1075) and restrict our review to the objections raised in its petition for rehearing of Opinion No. 249.[25]
 
 B. Reclassification
 
 45
 We find a failure of reasoned decisionmaking in the Commission's decision requiring reclassification of the Bear Creek storage costs. We briefly review the nature of FERC's ratemaking procedures in order to put the reclassification issue into perspective.
 
 
 46
 As explained by FERC, costs are initially "classified" as demand or commodity costs. Variable costs are normally classified initially as commodity costs and fixed costs as demand costs.
 
 
 47
 The next step is to allocate demand and commodity costs between jurisdictional and non-jurisdictional customers and among sales zones and customer classes. Demand costs relate to a customer's basic entitlement to receive gas and with the system's maintenance of capacity sufficient to serve maximum or peak needs. They are generally allocated on a peak responsibility basis.... Commodity costs relate to the pipeline's throughput and are allocated usually based on the customers' annual takes.
 
 
 48
 J.A. 200 (ALJ's initial decision). After costs have been allocated, rates are designed, "deciding how the allocated demand and commodity costs will be collected," J.A. 200, either in the commodity charge or the demand charge. "Rate design may or may not use the same classification method used for allocation." Id. Cost allocation "involves the determination of apportioning of total costs to various services and rate schedules [whereas] final rate design requires consideration of factors in addition to cost apportionment, such as marketing and competition. Accordingly, the procedure of reclassifying costs may be a required step." Tennessee Gas Pipeline Co., 36 F.E.R.C. p 61,071 at 61,161 (1986) (emphasis added). Thus it appears that the Commission's practice is to look to factors other than relationship to serving peak needs (demand costs) or annual needs (commodity costs) when it decides whether to put a cost into the commodity charge or the demand charge. And indeed, the Commission's discussion of these issues as they relate to the MFV rate design suggests that an important consideration is whether the costs are fixed or variable and whether they should be placed at risk.
 
 
 49
 The Commission found that the Bear Creek facility "neither supplements peak day needs nor reduces pipeline capacity requirements." Id. at 61,182. Since Bear Creek costs are incurred to serve the regular daily demands of its customers instead of the peak demand of customers' maximum entitlements they are "properly allocated only to sales customers" on the basis of annual sales volumes. Id. We read this as an allocation decision, holding that Bear Creek costs are to be "allocated as commodity costs related to sales service."[26] Id. at 61,183.
 
 
 50
 The Commission then went on, however, to require that these commodity costs be classified to the commodity charge. In a footnote to the allocation determination described above, the Commission stated that "Tennessee's further argument on the 'as-billed' aspect of its allocation procedure is mooted by our decision on this issue. All of the costs will be allocated on a volumetric basis and only to the sales customers." Id. at n. 71. Apparently the Commission intended by this statement to hold that Tennessee must classify the costs to the commodity charge in its rate design. The Commission purported to explain the footnote on rehearing: "Once this determination [to allocate the costs as commodity costs] has been made, it is no longer possible to classify costs on an 'as-billed' basis." 40 F.E.R.C. p 61,140 at 61,443. Thus the Commission seemed to contradict its earlier description of the rate design process, where it emphasized that the decision to allocate costs as commodity costs does not mean that these costs must therefore necessarily be collected in a commodity charge.
 
 
 51
 Tennessee had contended in evidence before the ALJ that "however [Bear Creek] costs are allocated, they should continue to be classified [to the demand charge] for purposes of rate design. The fixed charge Tennessee must pay to others, regardless of throughput, are clearly not variable and should not be classified as such in rates." J.A. 9. The Commission made no mention of whether it thought the Bear Creek costs are fixed or variable: even though the costs are incurred to serve regular daily demands, they might nonetheless be fixed in the sense that the pipeline makes an up-front investment in storage capacity. The Commission's order is, however, virtually impossible to decipher on this question, and we can discern no explanation for why it made the decision to classify Bear Creek costs to the commodity charge beyond the assertion (contradicted by its own earlier explanation of the rate design process) that the decision necessarily followed from the prior decision to allocate the costs as commodity costs. We therefore remand this issue to the Commission for further explanation.
 
 V. CONCLUSION
 
 52
 We affirm the Commission's decision to eliminate Tennessee's minimum bill, effective August 1, 1987. In so deciding we conclude that the Commission has reasonably interpreted Sec. 19 of the Natural Gas Act to allow itself the authority to make modifications in an order that have not been sought in a timely petition for rehearing. We find, however, that Columbia was required to file a new petition for rehearing after the modification in order to raise objections not raised in its first petition for rehearing of the order laying down the original effective date.
 
 
 53
 We dismiss Tennessee's petition appealing from FERC's rejection of its compliance filing on the classification of Bear Creek storage costs (in Docket No. 88-1075). In its petition for rehearing of the original order requiring reclassification (appealed separately in Docket No. 87-1368), however, Tennessee raised a valid argument that the Commission's treatment of the Bear Creek issue does not reflect reasoned decisionmaking. Accordingly, we remand that portion of the order to the Commission for further proceedings.
 
 
 
 [1]
 Pipeline customers normally reserve a maximum quantity that they might wish to purchase over a given period. Most customers actually take much less than this entitlement quantity
 
 
 [2]
 Tennessee was obliged under the settlement to implement the interim methods until December 31, 1985, at which time it was free to file new rates which departed from the methods. See infra at 1110-11
 
 
 [3]
 Under the MFV rate design, the commodity charge (see n. 5, infra ) contains variable costs, equity return and related taxes, and other production and storage costs and the demand charge contains the remaining fixed costs
 
 
 [4]
 Demand costs are costs, such as the cost of building excess capacity, incurred by Tennessee in order to live up to its supply obligations to customers who have reserved gas on the Tennessee system. Commodity costs, by contrast, are the costs incurred in supplying the regular daily demands of all customers
 
 
 [5]
 Tennessee's rates have two parts: a demand charge and a commodity charge. The demand charge is an upfront flat charge calculated on the basis of a customer's entitlement quantity and paid by the customer regardless of the amount of gas actually purchased. The commodity charge, by contrast, is a per-unit charge on gas that is actually taken, although with the minimum bill, Tennessee collects the commodity charge for gas the customer does not take if the customer fails to purchase 60% of its entitlement
 
 
 [6]
 Fixed costs are those costs that do not vary with the quantity of gas sold, such as investments in capital
 
 
 [7]
 Tennessee has not contested the appropriateness of this procedure
 
 
 [8]
 Tennessee argues that it presented evidence to the Commission that in 1985 its "Big Four" partial requirements customers reduced their purchases to less than a third of their entitlements. This evidence was not presented to the ALJ (indeed the ALJ's initial decision issued in 1984), but rather was asserted in a brief to the Commission urging reversal of the ALJ's decision to eliminate the minimum bill. More importantly, the evidence is not probative under the second justification since it relates to drops in volume experienced while Tennessee had a minimum bill in place; it therefore indicates nothing about how elimination of the bill would itself cause a drop. In fact, Tennessee originally introduced the argument for a different purpose altogether: to show that its minimum bill "only moderately affects the gas purchase decisions of the partial requirements customers." Joint Appendix ("J.A.") 336
 
 
 [9]
 Order No. 500 is currently on appeal in this court; Tennessee is a party to that appeal and will be able to argue its position that Order No. 500 is an inadequate or unlawful response to the take-or-pay problem
 
 
 [10]
 We also agree with the Commission that "Tennessee's [further] claim that it needs a minimum bill to operate efficiently is unpersuasive." Tennessee Gas Pipeline Co., 40 F.E.R.C. p 61,140 at 63,437 (1987)
 
 
 [11]
 This issue was specifically raised by Columbia in its answer to Tennessee's motion for clarification and the Commission addressed the point directly in its order denying rehearing. We find that Columbia had reasonable cause, 15 U.S.C.A. Sec. 717r, to raise the point in the answer rather than in its petition for rehearing because the issue of the Commission's power to modify its order was raised by Tennessee only after Columbia's petition had been filed. Cf. Public Service Commission of New York v. FPC, 543 F.2d 757, 771-75 n. 116 (D.C.Cir.1974), cert. denied sub nom. Sun Oil Co. v. Public Service Commission of New York, 424 U.S. 910, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976) (modification of prior decision does not generate a need to request another rehearing where litigant has already presented point to Commission and Commission has given it consideration)
 
 
 [12]
 We note that FERC frequently appears to treat untimely petitions for rehearing as motions for reconsideration. This treatment is disturbing; we can discern no reasoned distinction by the Commission for those petitions it considers as motions for reconsideration and those it summarily rejects for untimeliness. Compare Transcontinental Gas Pipe Line Corp., 44 F.E.R.C. p 61,046 (1988) with Hydro Development Group, Inc., 20 F.E.R.C. p 62,605 (1982); Turnbull & Zoch Drilling Co., 37 F.P.C. 255 (1967)
 
 
 [13]
 In Pan Am a party had filed a timely petition for rehearing which was deemed denied when the Commission did not respond within thirty days. 15 U.S.C.A. Sec. 717r(a). The Commission subsequently acted on the petition and reopened the proceedings before the time for judicial review had expired
 
 
 [14]
 See, e.g., State of New York v. United States, 568 F.2d 887, 893 n. 9 (2d Cir.1977), cert. denied sub nom. State of New York v. S & E Shipping Corp., 449 U.S. 887, 101 S.Ct. 242, 66 L.Ed.2d 113 (1980), (ICC Act empowers agency to reconsider and modify any aspect of order, not restricted to issues raised for rehearing); McDuffee Motor Freight Inc. v. United States, 543 F.2d 1181, 1184 (6th Cir.1976) (same); National Labor Relations Board v. Townsend, reh'g denied, 185 F.2d 378, 384 (9th Cir.1950), cert. denied, 341 U.S. 909, 71 S.Ct. 621, 95 L.Ed. 1346 (1951) (NLR Act empowers agency to modify order). See also American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 540, 90 S.Ct. 1288, 1293, 25 L.Ed.2d 547 (observing that "Congress has provided as respects some regulatory systems that the agency may modify any finding up until the record is filed with a court," citing NLR Act, FTC Act and 28 U.S.C. Sec. 2347(c)); Confederated Tribes of Warm Springs Reservation of Oregon v. United States, 177 Ct.Cl. 184 n. 3 (1967) (observing that ICC Act, FCC Act, FPC Act and NLR Act confer on agencies statutory right to modify orders on own initiative)
 
 
 [15]
 The Court held that this authority, however, expired when judicial review was sought. The Court distinguished different language in the Federal Trade Commission Act which provided specifically for modification "[a ]fter the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time." 325 U.S. at 342, 65 S.Ct. at 1169 (emphasis added)
 
 
 [16]
 We note, however, that judicial review can only be had of orders challenged in a timely petition for rehearing. The Commission cannot by granting reconsideration effect a waiver of this jurisdictional requirement. See Boston Gas, supra
 
 
 [17]
 Columbia sought to have the effective date made retroactive to February 1, 1983, December 31, 1985 or February 1, 1986, with each date corresponding to a different theory of the effect of the settlement agreement on the Commission's authority
 
 
 [18]
 We also hold today, infra, that if a party does not raise an argument that it could have raised in its first petition for review of a Commission action, it cannot preserve that argument for judicial review simply by filing a second petition for rehearing from a subsequent Commission order which implicates the same action. Since Columbia could not have raised its argument about the August 1, 1987 effective date in its first petition, Columbia would have been entitled to file a new petition after the modification was entered
 
 
 [19]
 The court in ASARCO suggested that the Act's strict requirements were designed not only to ensure that the Commission has an opportunity to address a point but also to ensure that all parties are on notice about the objections harbored by other parties to a Commission action
 It is reasonable to regard [the requirements] as the product of an awareness that FERC's complex and multi-party proceedings would soon overwhelm the system if agreed-upon settlements and acquiesced-in agency dispositions were not the rule rather than the exception. Accommodation is facilitated by requiring applications for rehearing, in which the remaining issues to which various parties object, and the various grounds for their objections, must be specified; and by enabling FERC to assume, in recasting its final order, and all the private parties to assume, in post-rehearing-application settlement negotiations, that those issues which a party did not consider important enough to raise cannot form a basis for that party's obstructing an accommodation which other parties are willing to accept.
 777 F.2d at 774.
 
 
 [20]
 It is arguable that Columbia's argument that the minimum bill should have been eliminated retroactively may be precluded by our decision in East Tennessee Natural Gas Co. v. FERC, 863 F.2d 932 (D.C.Cir.1988). We need not reach this issue, however
 
 
 [21]
 Columbia indicated at oral argument that it does not seek a holding from the court that the Commission should abrogate clear settlement language, but only that the language is either nonbinding or so ambiguous that the Commission should have construed it narrowly in order to effectuate its responsibility to craft just and reasonable rate orders
 
 
 [22]
 We note that Tennessee did make a new rate filing on July 31, 1985, and that issues arising in that filing were disposed of in a settlement dated April, 1986. The 1986 agreement explicitly acknowledged that the minimum bill litigation would proceed to decision and again that any changes in the minimum bill would be ordered prospectively from the date of a final Commission order. Columbia agreed to this settlement, with the proviso that it was not precluded from raising the arguments it has raised here and before the Commission, i.e., that the litigation was no longer governed by the prospectivity provision in the 1983 settlement and that the Commission was within its power to exercise discretion in setting the effective date. Columbia did not argue that the 1986 agreement superseded the 1983 agreement and that the proviso was meant to withdraw its agreement to the 1983 settlement, however interpreted
 
 
 [23]
 Almost all customers pay a demand charge. Tennessee does have a special rate for small general service customers which does not include a demand charge
 
 
 [24]
 In its first petition for rehearing, Tennessee argued that the Bear Creek classification decision was unsupported by record evidence, was inconsistent with Commission precedent and treatment of a similar class of costs ("Account No. 858" costs); and that the Commission had not borne its burden of proof as required by Sec. 5 of the Natural Gas Act. In its second petition for rehearing Tennessee raised the further arguments that the 1983 settlement precluded a decision on the Bear Creek issue and that the classification decision conflicted with the MFV rate design, exposing Tennessee to excessive risk of underrecovery of fixed costs. We can see no reason why these latter arguments could not also have been raised in the first petition
 
 
 [25]
 We rely on the Commission's representation in its Reply to Tennessee's Answer to Motion to Dismiss that the only consequence of dismissal is the one we have discussed, i.e., that the court will restrict review to the objections raised in Tennessee's petition for rehearing of Opinion No. 249. Neither party has identified any further harm to Tennessee that can flow from dismissal
 
 
 [26]
 Tennessee stated in its petition for rehearing that it was not challenging this determination